UNITED STATES of America, ex rel.
A. Scott POGUE, Plaintiff,

v.

AMERICAN HEALTHCORP,
INC., et al., Defendants.

No. 3:94–0515.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 14, 1997.

As Amended Sept. 26, 1997.

Van S. Vincent, Office of the U.S. Attorney, Nashville, TN, for U.S. ex rel.

Ralph W. Mello, Ames, Long, Scott, Seneff & Mello, Brentwood, TN, Larry Lamont Crain, Long, Sneff & Mello, Brentwood, TN, James B. Helmer, Jr., Paul B. Martins, Hel-

mer, Lugbill, Martins & Neff Co., L.P.A., Cincinnati, OH, for A. Scott Pogue.

Robert Jackson Walker, Patricia T. Meador, Bass, Berry & Sims, Nashville, TN, Steven Allen Riley, John Baxter Enkema, Bowen, Riley, Warnock & Jacobson, PLC, Nashville, TN, for American Healthcorp, Inc.

Robert Jackson Walker, Patricia T. Meador, Bryan E. Larson, Bass, Berry & Sims, Nashville, TN, Steven Allen Riley, John Baxter Enkema, Bowen, Riley, Warnock & Jacobson, PLC, Nashville, TN, for Diabetes Treatment Centers of America, Inc.

Ames Davis, Nancy S. Jones, Paula D. Walker, Waller, Lansden, Dortch & Davis, Nashville, TN, for West Paces Medical Center.

John G. Despriet, Dana M. Richens, Smith, Gambrell & Russell, Atlanta, GA, for Paul C. Davidson, Bruce W. Bode, Judson G. Black, Robert Dennis Steed, Anthony E. Karpas.

## *MEMORANDUM*

ECHOLS, District Judge.

Presently pending before the Court is Defendant West Paces Medical Center's ("West Paces's") Motion to Dismiss Plaintiff's Fourth Amended Complaint, to which Plaintiff has filed a Response. Also pending before the Court is the motion of Defendants Diabetes Treatment Centers of America ("DTCA"), and Paul C. Davidson, M.D., Bruce W. Bode, M.D., Judson G. Black, M.D., Robert Dennis Steed, M.D., and Anthony E. Karpas, M.D. (collectively "Atlanta Physicians"), to Dismiss for Lack of Subject Matter Jurisdiction, to which Plaintiff has filed a Response. For the reasons discussed herein, West Paces's Motion to Dismiss is hereby DENIED and DTCA and the Atlanta Physicians' Motion to Dismiss is likewise DENIED.

Plaintiff, a former DTCA employee, filed this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, alleging that all of the defendants had engaged in a scheme to defraud the United States government of Medicare and Medicaid monies. Plaintiff filed his first complaint under seal as required by the FCA. *Id.* § 3730(b). He then submitted an Amended and Second Amended Complaint. The Atlanta Physicians filed a motion to dismiss the Second Amended Complaint for failure to assert the FCA claim with particularity, as required by Federal Rule of Civil Procedure 9(b). In response, Plaintiff submitted a Third Amended Complaint. In an Order entered August 30, 1996, this Court denied in part the Atlanta Physicians' motion to dismiss, finding that the Second Amended Complaint provided the defendants with sufficient notice of Plaintiff's claims of fraud, but that the conspiracy claim was insufficiently pled. The Court granted Plaintiff leave to amend the complaint a fourth time.

West Paces now moves to dismiss the Fourth Amended Complaint with respect to the claims against it, contending, as did the Atlanta Physicians previously, that the complaint fails to state the fraud allegations with particularity. Additionally, DTCA and the Atlanta Physicians move to dismiss the suit on the ground that this Court lacks subject matter jurisdiction to hear Plaintiff's claims.

It is well-settled that a court's task in analyzing the sufficiency of a complaint for the purpose of a motion to dismiss is necessarily narrow and limited. The issue is not whether a claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Moreover, in reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, a court must review the complaint in the light most favorable to the non-moving party, construing all of its allegations in his or her favor. *Id.* A complaint should not be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "unless it appears beyond doubt that [non-moving party] can prove no set of facts in support of [his or her] claim which would entitle [him or her] to relief." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). *See also G.M. Engineers & Assocs. v. West Bloomfield Township*, 922 F.2d 328, 330 (6th

Cir.1990) (citing *Dugan v. Brooks*, 818 F.2d 513, 516 (6th Cir.1987)) ("[t]his court must accept all of the [claimant's] factual allegations as true and determine whether any set of facts consistent with the allegations would entitle [him or her] to relief").

West Paces asserts that the Fourth Amended Complaint fails to satisfy the heightened pleading standards for claims of fraud set forth in Federal Rule of Civil Procedure 9(b), and thus that the complaint should be dismissed for failure to state a claim upon which relief may be granted. In particular, West Paces contends that, despite the fact that Plaintiff has had several opportunities to amend his complaint to meet Rule 9(b)'s requirements, the Fourth Amended Complaint still fails to specify "when, where or how Plaintiff contends West Paces learned of this alleged fraud, or the identity of, or position held by, the person or persons who had such knowledge, and whose knowledge should be attributed to West Paces." Given the fact that the complaint's allegations span a twelve-year period, West Paces argues that it must be given specific information regarding the fraudulent transactions to which it is alleged to have been a party. Because Plaintiff does not make these crucial factual allegations, West Paces contends that the complaint does not provide sufficient notice of the FCA claims against it. West Paces asks the Court to dismiss the Fourth Amended Complaint with prejudice, as Plaintiff has failed to submit a viable complaint despite having been afforded ample opportunity to properly plead. *Hoover v. Langston Equipment Associates, Inc.*, 958 F.2d 742, 745–46 (6th Cir.1992).

■ Federal Rule of Civil Procedure 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Plaintiffs filing suit under the FCA must meet Rule 9(b)'s heightened pleading standard. *See United States ex rel. Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1476–77 (2d Cir.1995) (listing cases), *cert. denied,* —— U.S. ——, 116 S.Ct. 1836, 134 L.Ed.2d 939 (1996); *United States v. Kensington Hosp.*, 760 F.Supp. 1120 (E.D.Pa.1991). The Sixth Circuit requires that at a minimum a plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir.1993). However, the Sixth Circuit has also stressed that

> [i]n ruling on a motion to dismiss under Rule 9(b) for failure to plead fraud "with particularity," a court must factor in the policy of simplicity in pleading which the drafters of the Federal Rules codified in Rule 8. Indeed, Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather the two rules must be read in harmony. "Thus, it is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules."

*Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir.1988) (citations and footnote omitted). The overarching purpose of Rule 9(b) is to provide a defendant with fair notice of the claims against him, in order that he may prepare an adequate responsive pleading. *Id.*

■ In the present case, the Fourth Amended Complaint alleges that, between 1984 and 1996, West Paces entered into a series of incentive-based contracts with DTCA, whereby West Paces would pay DTCA a commission based on the number of diabetes patients admitted into the medical center. In addition, the complaint states that DTCA entered into contracts with the various Atlanta Physicians, ostensibly to serve as medical directors of the diabetes center located within West Paces's facility. The complaint alleges that in actuality the physicians' compensation under these contracts was based not upon the medical services provided, but upon the ability of the physicians to refer large numbers of diabetes patients to the center. The complaint avers that these contracts violated the federal law proscriptions against kickbacks and self-re-

ferrals, and that West Paces knew of this illegality. It alleges that West Paces nevertheless filed claims for Medicare and Medicaid reimbursement for the "services provided to patients whose admissions were illegally and fraudulently obtained," thereby violating the FCA.

After careful review of the Fourth Amended Complaint in light of the applicable law, the Court finds that it meets Rule 9(b)'s heightened pleading requirements. Keeping in mind that the primary purpose of the pleading standard is to ensure that Defendants receive notice of the charges against them, the Court finds that the complaint adequately describes Defendants' allegedly fraudulent scheme to defraud the United States of Medicare and Medicaid monies. Although no specific dates or West Paces employees are identified, the complaint alleges that the hospital participated in a systematic, fraudulent scheme, spanning the course of twelve years; thus, reference to a time frame and to "West Paces" generally is sufficient. As this Court noted in its denial of Atlanta Physicians' similarly-couched motion to dismiss the Second Amended Complaint, "[r]equiring Plaintiff to refer to the specific instances underlying each Medicare and Medicaid claim submission that he claims was fraudulent in his [complaint] would undermine Rule 8's admonishment to keep pleadings simplistic."

West Paces contends that the complaint's mere statement that West Paces "knowingly" participated in the alleged fraud, without supporting factual allegations, is unsatisfactory under Rule 9(b). However, that rule allows knowledge and intent to be pled generally. Further, Plaintiff has set forth facts supporting an inference of West Paces's knowledge of the scheme. *See Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir.), *reh'g denied,* 20 F.3d 1172 (5th Cir.1994). The complaint alleges that West Paces allowed DTCA's diabetes center to be established in its facility, that the Atlanta Physicians referred diabetes patients to the center, that West Paces paid DTCA a commission based on the number of diabetes patients admitted, and that it filed Medicare and Medicaid reimbursement claims for treatment of those patients. The Court finds these allegations sufficient to support the inference that West Paces knew that DTCA's purpose in hiring the Atlanta Physicians was to increase the number of diabetes patients referred to the center, and that the physicians' compensation and continued employment was based on the number of referrals made. As such, the Court concludes that West Paces's Motion to Dismiss should be DENIED.

DTCA and Atlanta Physicians (collectively "Defendants") move to dismiss Plaintiff's Fourth Amended Complaint for lack of subject matter jurisdiction. Defendants bring this motion under the FCA's jurisdictional limitation provision respecting *qui tam* suits, which states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A). Generally, Defendants contend that Plaintiff is not the original source of the information upon which the Complaint is based. Rather, Defendants allege Plaintiff's allegations are based upon information regarding DTCA's contracts with various hospitals and physicians that was publicly disclosed in newspaper articles, DTCA press releases, and federally-required prospectuses and annual reports filed by American Healthcorp, Inc. ("AHC"), DTCA's parent company, with the Securities and Exchange Commission ("SEC"). In particular, Defendants assert that (1) Plaintiff has no evidence of any transactions among the Defendants executed in violation of the Medicare and Medicaid laws or the FCA, and the evidence he does possess is based upon publicly disclosed information; and (2) Plaintiff is not an "original source" of the information on which this action is based. As such, Defendants assert that this Court lacks subject matter jurisdiction over the present case.

"The satisfaction of ... 31 U.S.C. § 3730(e)(4) [of the FCA] is ... an issue of subject matter jurisdiction." *United States ex rel. Gold v. Morrison–Knudsen Co. Inc.*, 870 F.Supp. 457 (N.D.N.Y.1994) (citing *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148 (2d Cir.), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993)), *aff'd*, 68 F.3d 1475 (2d Cir.1995). "The party invoking federal jurisdiction must 'allege in [its] pleading the facts essential to show jurisdiction,' and 'must support [those facts] by competent proof.'" *United States ex rel. Pentagen Technologies Int'l Ltd. v. CACI Int'l Inc.*, No. 94 Civ. 2925, 1996 WL 11299, at *3 (S.D.N.Y. Jan.4, 1996) (quoting *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)); *Madison–Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir.1996). The Court must examine the substance of the allegations as well as any other evidence before it, *id.* (citing *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir.1993)), and is empowered to resolve any factual disputes presented in determining the existence of subject matter jurisdiction. *Moir v. Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir.1990).

In the present case, therefore, Plaintiff bears the ultimate burden of establishing this Court's jurisdiction over his *qui tam* complaint. Plaintiff's task at this stage of the litigation is to prove either that the evidence of fraudulent transactions upon which his suit is based was not previously "publicly disclosed," or that he was an "original source" of the information underlying the disclosure. The Court must consider and resolve disputes within the factual record relevant to these issues.

The gravamen of Plaintiff's allegation is that Defendants participated in a scheme to defraud the United States by filing claims for Medicare and Medicaid reimbursement for services provided to diabetes patients who were illegally referred to various treatment centers established by DTCA in the Defendant hospitals. Specifically, as noted above, the Fourth Amended Complaint states that, between 1984 and 1996, a number of hospitals entered into a series of incentive-based contracts with DTCA, whereby the hospitals would pay DTCA a commission based on the number of diabetes patients admitted into the treatment centers located at the hospitals' facilities. In addition, the complaint states that, as a part of the alleged conspiracy, DTCA entered into contracts with a number of physicians, including the Atlanta Physicians, to serve as medical directors of the diabetes centers. The complaint alleges that the physicians' compensation under these contracts was based not upon the medical or administrative services provided, but upon the ability of the physicians to refer large numbers of diabetes patients to the center. The complaint avers that these contracts violated the federal law proscriptions against kickbacks and self-referrals, and that the hospitals, knowing of this illegality, filed claims for Medicare and Medicaid reimbursement for the "services provided to patients whose admissions were illegally and fraudulently obtained," thereby violating the FCA.

Defendants first assert that the information upon which Plaintiff's claims are based was previously "publicly disclosed." In particular, they point to several AHC annual reports and prospectuses, as well as DTCA press releases and independent newspaper articles, which they contend describe the contractual relationships among DTCA, the hospitals, and the physicians employed as medical directors.[1] Defendants additionally contend that, outside of this publicly revealed information, Plaintiff concededly has no evidence of Defendants' execution of a transac-

---

1. The Court notes that, instead of submitting the actual newspaper articles and company reports at issue, Defendants have chosen to submit personally-typed excerpts therefrom. While the Federal Rules of Evidence may permit for self-authentication of these types of documents, *see, e.g.,* F.R.E. 902(6) (exempting "[p]rinted materi-als purporting to be newspapers or periodicals"), that rule does extend to personally-typed excerpts. Nevertheless, even assuming the admissibility of Defendants' submissions, as discussed below, the Court is of the opinion that such evidence is insufficient to trigger the jurisdictional bar.

tion or transactions in violation of the Medicare and Medicaid laws or the FCA.[2] Thus, Defendants assert that Plaintiff's allegations are based entirely on publicly disclosed transactions, which deprives the Court of jurisdiction.

Plaintiff counters that there was no public disclosure of the information underlying his claims against Defendants. He initially asserts that the revelations in AHC's company prospectuses, annual reports, and press releases do not qualify as "public disclosures," because such sources do not fall within the enumerated media set forth in Section 3730(e)(4), which refers to allegations or transactions revealed in a "criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or [in] the news media." 31 U.S.C. § 3730(e)(4).[3]

2. Defendants also assert that none of the contracts pointed to by Plaintiff between DTCA, the hospitals, and the "medical directors" facially violate any of the proscriptions against self-referrals and kickbacks set forth in the Medicare and Medicaid laws. 42 U.S.C. §§ 1320a–7b(b); 1395nn. As such, Defendants claim Plaintiff has no evidence whatsoever of FCA violations.

Section 1320a–7b(b) provides in relevant part:
(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program
. . .
shall be guilty of a felony. . . .
(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under subchapter XVIII of this chapter or a State health care program
. . .
shall be guilty of a felony. . . .
Section 1395nn provides in relevant part:
(a) Prohibition of certain referrals
(1) In general

Defendants attempt to characterize AHC's annual reports and prospectuses as "administrative reports," because such documents are legally required to be filed with the Securities and Exchange Commission ("SEC"), and because the very purpose of such requirement is to make corporate information available to the public. Although the issue of whether SEC-filed reports qualify as "administrative reports" under Section 3730(e)(4) has not been directly addressed by the courts, in *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509 (8th Cir.1994), the Eighth Circuit Court of Appeals stated that the defendant corporation's "corporate reports" were "insufficient as a jurisdictional bar because they [were] not contemplated by the terms of the statute." *Id.* at 1512 n. 2. In the present case, the Court concludes that it is unnecessary to determine whether the SEC-filed reports should be deemed "administrative reports" under Section 3730(e)(4).

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then—
(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
The issue of whether Defendants' transactions facially violated the above laws is not before the Court in the present motion. Rather, as discussed above, the Court's present task is to discern whether the information underlying Plaintiff's complaint was previously publicly disclosed, thereby divesting the Court of subject matter jurisdiction to even consider the merits of Plaintiff's charges.

3. Most courts hold that the above-cited list is exhaustive. *See United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1499–1500 (11th Cir. 1991); *United States ex rel. Fine v. MK–Ferguson Co.*, 861 F.Supp. 1544, 1550 (D.N.M.1994), *aff'd*, 99 F.3d 1538 (10th Cir.1996); *United States ex rel. LeBlanc v. Raytheon Co.*, 913 F.2d 17, 20 (1st Cir.1990). *But see United States ex rel. Stinson, Lyons, Gerlin & Bustamante v. Prudential Ins. Co. of America*, 736 F.Supp. 614 (D.N.J.1990) (holding that the legislative history and purpose of the jurisdictional statute suggest that the above list of media sources is merely exemplary, rather than exclusive), *aff'd*, 944 F.2d 1149 (2d Cir.1991).

As discussed below, even assuming such reports fall within the enumerated media categories, the Court finds that the information provided in them does not give rise to an inference of fraud, and thus that they do not publicly disclose the transactions upon which Plaintiff's suit is based. For purposes of this motion, however, the Court will assume that AHC's annual reports and prospectuses are "administrative reports;" as such, the Court will consider them in deciding whether Section 3730(e)(4) precludes the exercise of jurisdiction in this case.[4]

Plaintiff contends that the information related in the annual reports, prospectuses, and newspaper articles was insufficient to trigger the jurisdictional bar. In particular, he argues that Section 3730(e)(4) bars actions based on publicly disclosed "allegations or transactions," not merely information relating to such allegations or transactions. Plaintiff asserts that both the legislative history of the statute and the interpretive case law make clear that a qualifying disclosure must be of the specific transaction or transactions underlying the plaintiff's FCA claim, and must reveal all of the essential elements necessary to give rise to an inference of fraud. According to Plaintiff, in the present case the documents cited by Defendants as providing "public disclosures" of the fraudulent scheme reveal only part of the story, and thus do not give rise to the requisite inference of fraud. Specifically, Plaintiff contends that, although the documents in question generally describe the contracts between (1) DTCA and the hospitals, and (2) DTCA and the medical directors, there is no revelation of (3) the fact that the hospitals filed numerous claims for Medicare and Medicaid reimbursement arising from treatment of the increased volume of diabetes patients brought in through referrals by the medical directors under these contracts. Also, Plaintiff alleges the compensation paid to the doctors serving as directors of the clinics in the hospitals was not based upon duties performed by the doctors but upon the number of patients the doctors referred to the clinics. As such, Plaintiff asserts that the essential elements of the alleged fraudulent scheme were never publicly disclosed, and thus that the reader of the SEC-filed reports and newspaper articles could not infer that fraud had taken place.

Defendants counter that all of the essential elements giving rise to an inference of fraud were revealed in the documents in question. They state:

> [T]here are principally two transactions that comprise the essential elements of the claim as Mr. Pogue has asserted it: first, that DTCA had incentive-based contracts with hospitals under which the hospitals would pay DTCA a fee based on the number of diabetes patients admitted to the hospital ... and second, that DTCA paid certain physicians a fee to serve as medical directors of their diabetes treatment centers....

Defendants contend that revelation of these two transactions is sufficient to support an inference, albeit incorrect, that fraudulent claims were filed with the Medicare and Medicaid systems for treatment of the diabetes patients brought into the centers through operation of the contracts. Further, Defendants make the converse argument that public disclosure of the fact that "[f]alse or fraudulent claims were submitted to Medicare and/or Medicaid for payment" is unnecessary to trigger the jurisdictional bar, because that statement "is the conclusory allegation that Defendants have committed fraud." Defendants also assert that public disclosure of the following alleged facts is unnecessary to support an inference of fraud: (1) statutory "safe harbor" provisions are inapplicable to Defendants' contractual relationships; (2) the medical directors were overpaid for the "nominal" services they provided; and (3) the specific identity of the

---

4. The Court notes that Defendants make no attempt to counter Plaintiff's contention that DTCA's press releases do not fall within Section 3730(e)(4)'s enumerated media. As such, the Court will not consider them in determining the jurisdictional question. Similarly, Plaintiff apparently does not dispute that the independently published articles in the *Tennessean* on April 7, 1992, and March 20, 1994, and in the *Investor's Business Daily* on December 6, 1993, all of which discuss DTCA's business structure, are of the type listed in Section 3730(e)(4); thus, the content of those articles will be considered.

physicians and hospitals involved in the alleged fraud. Defendants contend that, because the requisite type of information was indisputably publicly revealed, this action is barred.

■ The parties agree that *United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645 (D.C.Cir.1994), provides the most cogent analysis of the issue of what type of information must be "publicly disclosed" to trigger the jurisdictional bar. In *Springfield,* the District of Columbia Circuit Court of Appeals engaged in a lengthy discussion of the legislative history of the FCA, and concluded that

> [t]he history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior. The 1986 amendments [in which Section 3730(e)(4) was included] inevitably reflect the long process of trial and error that engendered them. They must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.

*Id.* at 651. In light of these considerations, the court noted that "Congress did not prescribe by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed." *Id.* at 653. The court stated, however, that mere disclosure of information relating to a relator's allegations is insufficient to trigger the jurisdictional limitation. *Id.* "The Act bars suits based on publicly disclosed 'allegations

or transactions,' not information." *Id.* (quoting *Wang v. FMC Corp.,* 975 F.2d 1412, 1418 (9th Cir.1992)).

■ The court next expounded on the issue of what constitutes public disclosure of "transactions" under the statute:

> The term "transaction" suggests an exchange between two parties or things that reciprocally affect or influence one another.... [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transactions themselves were in the public domain.

*Id.* at 654.[5] The court concluded that Congress intended Section 3730(e)(4) to preclude *qui tam* actions when there is public disclosure of either the allegation of fraud, "Z", or the elements essential to inference of such fraud, "X" and "Y", since in these cases "the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for *qui tam* suits." *Id.*[6]

Other courts considering the issue of the quantum and type of public disclosures necessary to preclude *qui tam* suits have generally applied the same rule as that set forth in *Springfield*—namely, that there must be publication of the essential elements giving rise to an inference of fraud. *See Rabushka,*

---

5. The court stated that its formula for determining the requisite level of public disclosure derived from the competing policies underlying the jurisdiction provision:

> [W]hen X by itself is in the public domain, and its presence is essential but not sufficient to suggest fraud, the public fisc only suffers when the whistle-blower's suit is banned. When X *and* Y surface publicly, or when Z is broadcast, however, there is little need for *qui tam* actions, which would tend to be suits that the government presumably has chosen not to pursue or which might decrease the government's recovery in suits it has chosen to pursue.

14 F.3d at 654.

6. The court cautioned that the simple publication of the critical elements of fraud may not suffice in some instances. Specifically, the court noted that the *form* of the public disclosure may not be readily accessible to the public, and thus may not be adequate to give rise to the requisite inference that fraud occurred. *Id.* at 655. For example, the court noted that an engineering blueprint filed with a public agency would be incomprehensible to the nonexpert putative relator. *Id.*

40 F.3d at 1514 (relying on legislative history and *Springfield* for its conclusion that "the information put in the public domain [must] present so clear or substantial an indication of foul play as to qualify as either an allegation of fraud or a fraudulent transaction"); *United States ex rel. Mikes v. Straus*, 931 F.Supp. 248, 254 (S.D.N.Y.) ("[T]he court must ask whether the relator scooped its allegations from information in the public domain and that without such information the relator would never have thought of the allegations"), *motion to certify for appeal denied*, 939 F.Supp. 301 (S.D.N.Y.1996).

■ In the present case, Plaintiff's charge against Defendants is that they defrauded the United States by filing claims for Medicare and Medicaid reimbursement for services provided to diabetes patients who were illegally referred to the various treatment centers established by DTCA in the defendant hospitals. This Court has previously held that, when patients are referred for treatment in violation of the self-referral and anti-kickback provisions, the submission of claims for Medicare and Medicaid monies for the treatment of such patients violates the FCA.[7] The alleged FCA violations in this case therefore consist of the following transactions: (1) DTCA's incentive-based contracts with the hospitals, whereby DTCA's commission fees paid by the hospitals depended on the number of diabetes patients treated at the hospitals; (2) DTCA's tacit or explicit agreements with the physicians, whereby the physicians referred diabetes patients to the hospitals under contracts with DTCA in return for compensation as "medi-

cal directors" based upon the number of potential patients to be or actually referred to the hospitals by the physicians; and (3) the hospitals' filing of claims with the United States for Medicare and Medicaid reimbursement for treatment of diabetes patients referred by the medical directors to the hospitals.[8]

The documents in question consist of excerpts from three independent news reports, two DTCA prospectuses and one DTCA annual report. After careful review of the information disclosed in these sources, the Court finds that they do not publicly reveal the essential transactions underlying Plaintiff's FCA claim. First, there is no mention in any of the documents that the medical directors made referrals of patients to the diabetes centers. Although Defendants point to AHC's 1991 prospectus, which discusses the possibility that changing Medicare and Medicaid legislation regarding physician referrals could adversely affect the company's contractual relationships with physicians, the Court does not find this statement to be a clear disclosure of the fact that the medical directors were indeed referring diabetes patients to DTCA-run centers. In fact, other language in the same document indicates the medical directors' duties to be "medical supervision, liaison with the hospital's medical staff, quality control and staff and patient education;" no mention of patient referrals is made. The self-referral and anti-kickback provisions both prohibit illegal *referrals*. 42 U.S.C. §§ 1320a–7b(b) (prohibiting the offer or acceptance of kickbacks for referrals); 1395nn(a) ("Prohibition of certain referrals"). Plaintiff alleges the fees paid to

---

7. Of course, the filing of such claims, in order to be fraudulent under the FCA, must be done with knowledge of the illegality underlying the services for which reimbursement is requested. *See Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994), *criticized on other grounds by United States ex rel. Pogue v. American Healthcorp, Inc.*, 914 F.Supp. 1507, 1508 (M.D.Tenn.1996).

8. The Court notes that Defendants, in their reply brief to Plaintiff's response, modify their original contention regarding the transactions which must be publicly disclosed in order to trigger the jurisdictional bar. They state:

[T]here are at most *four* elements the sum of which comprises Mr. Pogue's allegation that a

violation of the False Claims Act has occurred[:]

$X$ = The defendant hospitals paid DTCA a contingent fee based upon the number of patients who had diabetes and were admitted to the hospitals.

$X_1$ = The defendant hospitals submitted claims associated with certain of these patients to Medicare or Medicaid.

$Y$ = DTCA entered into contracts with defendant physicians and paid each of said physicians a fee to serve as a medical director of a diabetes treatment center.

$Y_2$ = In some instances, the doctors referred their patients to the hospitals where the diabetes treatment center was located.

physicians serving as directors were not uniform and were not based upon the services actually performed as directors of the clinics. Without knowledge of the fact that referrals were being made by the medical directors to DTCA-run centers, the inference that such referrals were in violation of those laws could not be made by the reader.

In the same vein, there is no public revelation of the alleged fact that the defendant hospitals filed Medicare and Medicaid claims for the services provided to patients referred by the medical directors. Defendant points to AHC's 1993 prospectus, which states that "[p]atients receiving services from the diabetes treatment center are charged by the hospital for typical hospital services. Health insurance, including Medicare and Medicaid, cover[s] charges incurred on an inpatient basis on the same basis as non-diabetes related inpatient episodes. Many insurance plans, including Medicare, also provide coverage for outpatient education services for people with diabetes." [9] Again, this language is too general to put the reader on the trail of the alleged illegal referral scheme perpetrated by Defendants, because it fails to establish the connection between the referrals of patients by the medical directors to the diabetes centers and the filing of Medicare and Medicaid claims for such referred patients. The crux of Plaintiff's FCA claim is that reimbursement claims were filed *for the treatment of illegally-referred patients;* without disclosure of the facts that patients were referred by the medical directors, and that Medicare and Medicaid claims were filed for those referred patients, there is no basis for inference that false claims were submitted.

■ A review of the case law regarding the type of "public disclosure" necessary to trigger the jurisdictional bar lends further support to the Court's conclusion. Where the disclosures are of facially valid or innocuous transactions, courts decline to read Section 3730(e)(4) so broadly as to assume that the reader will construct a theory of a fraudulent scheme from such information. *See*

*Mikes,* 931 F.Supp. at 254 (holding that disclosures in a prior litigation regarding the defendant's illegal receipt of kickbacks for referrals of patients did not reveal the essential elements of the plaintiff's FCA claim that the defendant filed Medicare and Medicaid claims for unnecessarily-ordered tests given to his patients); *Springfield,* 14 F.3d at 655 (holding that pay vouchers and telephone records discovered in an earlier suit did not publicly disclose the essential elements of the plaintiff's claim that an arbitrator submitted false expense bills to the United States, because the vouchers and records provided no inherent indication of fraud); *Rabushka,* 40 F.3d at 1512 (finding that no inference of fraud regarding the defendant's reported pension liabilities was raised through various reports describing the defendant's ostensibly legitimate transactions). In cases where the essential transactions underlying the fraud claim are found to have been publicly disclosed, the revelations at issue are much more precise, and pointedly imply that fraud has taken place. *See United States ex rel. Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 687 (D.C.Cir.1997) ("[T]he public disclosures here specifically identify the nature of the fraud—illegal retention of monies owed to the government and unauthorized administrative approval of the practice—as well as the federal employee actors engaged in the allegedly fraudulent activity"); *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568, 572 (10th Cir.1995) (precluding a *qui tam* suit where the earlier public disclosure of the same fraud rendered easily identifiable the parties and transactions alleged in the relator's complaint, and "set the government squarely on the trail of the alleged fraud without [the relator's] assistance").

Overall, the Court is unconvinced that the disclosures regarding Defendants' relationships made prior to the filing of this action sufficiently put the reader on notice of the allegedly incestuous relationship among the Defendants, and the resultant fraud perpetrated against the United States. The general descriptions of DTCA's business strate-

---

**9.** The Court notes that this portion of the 1993 prospectus was not included as an exhibit in the record. For purposes of this motion, however, the Court will consider it to be competent evidence pertinent to the jurisdictional question.

gies reported in the sources provided by Defendants do not give rise to an inference of the type of fraudulent scheme alleged by Plaintiff. To invoke the jurisdictional bar based on the revelation of the innocuous disclosures in this case would undermine the overarching goal of the *qui tam* provisions to permit those with direct, nonpublic evidence of fraud to sue based upon that information. *See* 31 U.S.C. § 3730(b) (permitting private plaintiffs to bring *qui tam* actions); *id.* § 3730(d) (providing that such plaintiffs are entitled to a portion of the damages awarded); *id.* § 3730(e)(4)(B) (providing that, even where the "allegations or transactions" underlying the relator's complaint have been publicly disclosed, the relator may proceed if she is an "original source" of the information, having "direct and independent" knowledge of the facts); *Springfield,* 14 F.3d at 650–51 (noting that the legislative history of the 1986 amendments to the FCA, including Section 3730(e)(4), stated that such amendments were intended to increase the incentives for private individuals to sue on behalf of the government).[10]

Because the Court finds that the disclosures identified by Defendants are not of the underlying "allegations or transactions" in Plaintiff's complaint, it is unnecessary to determine whether Plaintiff was an "original source" of the publicly revealed information. 31 U.S.C. § 3730(e)(4); *Springfield,* 14 F.3d at 651 ("If—and only if—the answer to the [question of whether the relator's "allegations or transactions" have been publicly disclosed] is affirmative, will the court then proceed to the "original source" inquiry") (citing *Wang v. FMC Corp.,* 975 F.2d 1412, 1416 (9th Cir.1992)).

For the foregoing reasons, the Court finds that Plaintiff has satisfied his burden of proving that this Court has subject matter jurisdiction over his *qui tam* action. Accordingly, DTCA and the Atlanta Physicians' Motion to Dismiss is hereby DENIED, and West Paces's Motion to Dismiss is likewise DENIED.

---

**10.** Defendants repeatedly assert that Plaintiff has no evidence to support his FCA allegations, and thus that this case must be dismissed. However, the issue of the sufficiency of Plaintiff's evidence is not before the Court in the present motion. Rather, as noted above, the sole question at the present stage is whether the Court is divested of subject matter jurisdiction because the Plaintiff's allegations are based on publicly disclosed facts. As the *Springfield* court stated, "[t]o the extent that the plaintiff comes forward only with a bare allegation unsupported by proof, the district court has ample tools with which to dismiss the case." 14 F.3d at 655 n. 10 (citing, inter alia, Fed.R.Civ.P. 56).