*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0297P (6th Cir.)
File Name: 03a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD M. YUHASZ,
  *Plaintiff-Appellant,*

*v.*

BRUSH WELLMAN, INC.,
  *Defendant-Appellee.*

No. 02-3087

---

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07237—James G. Carr, District Judge.

Argued: August 1, 2003

Decided and Filed: August 20, 2003

Before: KENNEDY, GILMAN and GIBBONS, Circuit
Judges.

---

## COUNSEL

**ARGUED:** Dennis E. Murray, Jr., MURRAY & MURRAY,
Sandusky, Ohio, for Appellant. Geoffrey J. Ritts, JONES
DAY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dennis
E. Murray, Jr., Charles M. Murray, Barbara Quinn Smith,

MURRAY & MURRAY, Sandusky, Ohio, for Appellant.
Geoffrey J. Ritts, Dennis M. Kelly, JONES DAY, Cleveland,
Ohio, for Appellee.

---

## OPINION

---

JULIA SMITH GIBBONS, Circuit Judge. Relator Richard
M. Yuhasz brought a *qui tam* action against defendant-
appellant Brush Wellman, Inc. (Brush), claiming that Brush
violated the False Claims Act (FCA), 31 U.S.C. § 3729 *et
seq.*, and wrongfully terminated him in retaliation for his
allegations of wrongdoing. After the United States declined
to intervene, Brush moved to dismiss the case pursuant to
Rules 9(b) and 12(b)(6) of the Federal Rules of Civil
Procedure, and the district court granted the motion. For the
reasons set forth below, we affirm the judgment of the district
court.

## I.

Relator Yuhasz was employed as a laboratory manager for
Brush at Brush's bronze alloy manufacturing facility in
Lorain, Ohio, between September 1996 and January 2000. At
this facility, Brush produces "'super' alloys, spinodal alloys,
and other specialty alloys" that are supplied to the United
States both directly and through intermediaries, including
distributors, for use in aerospace and military aviation. Some
of the alloys, supplied under requirements of and pursuant to
contracts with the United States, are subjected to further
processing and manufacturing before being delivered to the
United States.

Yuhasz was hired to design and establish, and then operate
as manager, a testing laboratory for its Lorain facility. The
laboratory was established to conduct chemical, mechanical,
and physical testing of Brush's alloys. At the laboratory,

Yuhasz established the specifications for the laboratory equipment and both conducted and supervised testing procedures.

In order to claim or receive payments under government contracts, Brush must submit "certifications of compliance with technical specifications stating, representing, and warranting that the alloys were in strict conformity with specifications and that [Brush] was, thereby, legally entitled to claim and receive payment." These certifications include certification pursuant to Aerospace Materials Specifications, certification as to compliance with "QQC" specifications (a government standard), and certification pursuant to the specifications of the American Society for Testing and Materials.

On April 14, 2000, Yuhasz filed this *qui tam* action, alleging that Brush violated the FCA by making false certifications by itself or through intermediaries and that Brush wrongfully terminated him in retaliation for his allegations of improper conduct. After investigating Yuhasz's allegations, the United States declined to intervene on July 11, 2001. On September 7, 2001, Brush moved to dismiss the case for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted Brush's motion to dismiss on December 14, 2001. On January 8, 2002, Yuhasz filed his notice of appeal.

## II.

A district court's grant of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed *de novo*. *Goad v. Mitchell*, 297 F.3d 497, 500 (6th Cir. 2002). Pursuant to Rule 12(b)(6), an action may be dismissed if the complaint fails to state a claim upon which relief can be granted. When considering a motion to dismiss, all well-pleaded allegations in the complaint are treated as true, and the dismissal of the complaint is deemed proper "only 'if it appears beyond doubt that the plaintiff can prove

no set of facts in support of its claims that would entitle it to relief[.]'" *Id.* (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 638 (6th Cir. 2001)); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## III.

According to the FCA:

> Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729. The purpose of the FCA is "to encourage any individual knowing of Government fraud to bring that information forward." *United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 938 (6th Cir. 1997) (*McKenzie I*) (quoting S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266); *see also United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) ("'[T]he purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'") (quoting H.R. Rep. No. 99-660, at 22 (1986)). If, as in this case, the government does not assert its statutory right to take over the case, the relator can recover between twenty-five and thirty percent of any monies recovered from a settlement or judgment, in addition to reasonable expenses and attorneys' fees and costs. 31 U.S.C. § 3730(d)(2).

Yuhasz claims that Brush, by itself or through intermediaries, submitted fraudulent certifications and claims for payment to the United States and received payment from the United States for alloys not meeting government specifications, in violation of the FCA. Specifically, Yuhasz alleges that Brush

had actual knowledge and/or acted in deliberate disregard or ignorance of the truth or falsity of: (i) alloy product that was off-specification due to defects such as cracks; (ii) false and fraudulent certifications of compliance with technical specifications; (iii) improper traceability and identifibility controls with respect to lots of alloy bar stock; (iv) beryllium contamination in alloys, rendering such alloys off-specification; (v) [Brush's] failure to perform requisite tests on the alloys, such as the mercurious nitrate testing; and, (vi) the fact that requisite internal controls were not in place, rendering alloy products untraceable and unidentifiable.

The district court granted Brush's motion to dismiss, concluding that since the complaint "did not state a specific false claim submitted to the government," Yuhasz "did not allege a FCA claim with sufficient particularity as required under Rule 9(b)." *Yuhasz v. Brush Wellman, Inc.*, 181 F.Supp.2d 785, 794 (N.D.Ohio 2001).

Pursuant to Federal Rule of Civil Procedure 9(b), in any complaint averring fraud or mistake, "the circumstances constituting fraud or mistake shall be stated with particularity." The heightened pleading standard set forth in Rule 9(b) applies to complaints brought under the FCA. "[C]omplaints brought under the FCA must fulfill the requirements of Rule 9(b) – defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001); *see also United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997); *Gold v.*

*Morrison-Knudsen Co.*, 68 F.3d 1475, 1476 (2d Cir. 1995); *United States ex rel. Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562, 568 (11th Cir. 1994). The requirement that fraud be plead with particularity need not be relaxed in FCA cases in order to protect the public because the government's ability to intervene on the basis of information brought to its attention vindicates the public interest. The Sixth Circuit interprets Rule 9(b) as requiring plaintiffs to "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-162 (6th Cir. 1993) (quotation omitted).

The district court correctly found that Yuhasz had failed to allege an FCA claim with sufficient particularity as required by Rule 9(b). Yuhasz's complaint is short on specifics. For example, the complaint notes only that "*certain* testing that was outsourced according to a particular EAB number did not match-up to any heat number for alloy bar stock" and that "*certain* alloys of [Brush] *may have been* mismarked." (emphasis added). However, the complaint contains no particularized allegations of wrongdoing. The failure to identify specific parties, contracts, or fraudulent acts requires dismissal. *See United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1312 (11th Cir. 2002) ("failure to allege with any specificity if – or when – any actual improper claims were submitted to the Government is indeed fatal"); *U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F.Supp.2d 141, 147 (D. Mass. 2000) ("Relator's First Amended Complaint, in essence, sets out a methodology by which the vendors might have produced false invoices, which in turn could have led to false claims. Without citing a single false claim arising from an allegedly false invoice, Relator has not met even a bare-bones Rule 9(b) test."); *United States ex rel. Butler v. Magellan Health Serv., Inc.*, 101 F.Supp.2d 1365, 1369 (M.D. Fla. 2000) ("Plaintiff does plead a fraudulent scheme of conduct which may well be prohibited by law. However, Plaintiff pleads no specific occurrences of a false claim. . . .

[T]he absence of specific allegations of fraudulent false claims is determinative.").

Yuhasz concedes that he "is unable to identify a specific claim submitted directly to the United States by a prime contractor who incorporated [Brush's] metal alloys into the finished product sold to the government," but argues that he "is entitled to a relaxed standard of pleading due to the length and complexity of [Brush's] fraud." Yuhasz notes that the complaint "alleges fraudulent acts occurring over a period exceeding two years, and affecting virtually every alloy manufactured by [Brush] during that period." As the district court observed, however, a plaintiff should not be able to avoid the specificity requirements of Rule 9(b) by "relying upon the complexity of the edifice which he created." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 198 F.R.D. 560, 563 (N.D. Ga. 2000), *aff'd*, 290 F.3d 1301 (11th Cir. 2002). Moreover, none of the cases upon which Yuhasz principally relies, *United States ex rel. Roby v. Boeing Co.*, 184 F.R.D. 107 (S.D. Ohio 1998), *United States v. United Technologies*, No. C-3-99-093, 2000 WL 988238 (S.D. Ohio March 20, 2000), and *United States v. Pogue*, 977 F. Supp. 1329 (M.D. Tenn. 1997), supports his position.

In *Roby*, the plaintiff alleged that defendant The Boeing Corporation (Boeing) and its supplier violated the FCA "by manufacturing and selling defective transmission gears to the United States via Boeing's CH-47(D) Chinook Army helicopters." 184 F.R.D. at 108. Boeing filed a motion to dismiss, arguing that "because of the breadth of the accusation against it, [defendant] can only speculate as to which of the 300 . . . gears in service today are alleged to be nonconforming." *Id.* at 110. The district court denied Boeing's motion and noted that the complaint alleged that Boeing "acted with the knowledge of falsity or reckless disregard for the truth with respect to *every* CH-47(D) helicopter it delivered to the United States." *Id.* (emphasis added).

Yuhasz argues that the "facts of the instant case are strikingly similar to those before the court in *Roby*." This is not correct. In the instant case, Yuhasz asserts in its brief only that "*virtually* every certification" was fraudulent and that "*virtually* every alloy certified by [Brush] during the time specified in the Complaint was non-compliant." (emphasis added). The language of the complaint itself is even less specific, stating only that "*certain* testing that was outsourced according to a particular EAB number did not match-up to any heat number for alloy bar stock," that "*certain* alloys may have been mismarked," that "Yuhasz, upon accessing the original certifications, *often* discovered that the requisite mercurious nitrate testing had not been performed," that "*approximately 5%* of the product, and particularly smaller diameter product, failed to meet the requisite tensile strength," that "drums were *often* not labeled," and that "*many* of the certifications of compliance indicated the wrong alloy." (emphasis added). Furthermore, in *Roby* the plaintiff identified the specific contract at issue (the CH47(D) helicopter contract) and stated when, where, and how false statements were made to the government (on Forms DD-250 presented to the government). 184 F.R.D. at 110. In the instant case, Yuhasz provides no such information. *Roby* thus is easily distinguishable.

In *United Technologies*, the government alleged that Pratt and Whitney (Pratt), a division of defendant United Technologies Corporation (UTC), fraudulently submitted a contract bid that "knowingly overstated" the prices to be charged by Pratt's subcontractors. 2000 WL 988238 at *1. The government further alleged that each bill, invoice, and price later presented by Pratt to the government reflected these inflations. *Id.* Pratt filed a motion to dismiss, arguing that the government failed to specify which of its invoices were false claims. *Id.* at *5. The district court denied Pratt's motion, noting that the complaint alleged that "*all* of the invoices, bills, and prices submitted by Pratt to the Air Force were based on that initial 'inflation,'" and as a result "UTC should be able to identify the invoices, bills, and prices at

issue." *Id.* at *8 (emphasis in original). In the instant case, however, not only has Yuhasz not identified any invoices submitted by Brush to the government based on the alleged fraud, the indefinite nature of his allegations does not provide Brush with any way of identifying those invoices. Moreover, in *United Technologies* the plaintiff identified the document presented to the government that contained the false information (Pratt's "best and final offer") and identified both the parties and the specific contract that was entered into based upon that false information (a contract between the government and United Technologies to provide the Air Force with high-performance jet engines). *Id.* at *1. That level of specificity is completely absent here.

Finally, in *Pogue*, the plaintiff alleged that defendants West Paces Medical Center (West Paces), Diabetes Treatment Centers of America (DTCA), and a group of Atlanta physicians engaged in a scheme to defraud the government of Medicare and Medicaid funds. 977 F. Supp. at 1331. The defendants filed a motion to dismiss, arguing that the complaint failed "to specify 'when, where, or how Plaintiff contends that West Paces learned of this alleged fraud, or the identity of, or position held by, the person or persons who had such knowledge, and whose knowledge should be attributed to West Paces.'" *Id.* at 1332. The district court denied defendants' motion and stated that "[a]lthough no specific dates or West Paces employees are identified, the complaint alleges that the hospital participated in a systematic, fraudulent scheme, spanning the course of twelve years; thus, reference to a time frame and to 'West Paces' generally is sufficient." *Id.* at 1333. Yuhasz argues that in this case, as in *Pogue*, the court should not require "the specific dates on which the invoices were submitted." However, Yuhasz fails to recognize that in *Pogue* the lack of specificity with regard to the invoices was balanced against the fact that the plaintiff identified the specific parties and contracts at issue (between West Paces and DTCA and between DTCA and the Atlanta physicians). Here, the only party that Yuhasz identifies is Brush.

In his briefs to this court, Yuhasz also argues that he should not be required to plead the specifics of information "within [Brush's] control." By failing to state specifically that Brush's control is exclusive, the position taken by Yuhasz on appeal differs from that taken in the complaint, which stated:

> With respect to the alloy products produced or processed by [Brush] for the requirements of the government pursuant to government contracts, [Brush] is in a position of superior knowledge, and possessed *exclusive control* over the means of access to information, as to the specific nature of such requirements or contracts.

(emphasis added). In its response to Brush's motion to dismiss, Yuhasz also claimed that "an exception exists when certain information is within the *exclusive possession* of the defendant." (emphasis added). The district court rejected this argument, explaining that Yuhasz "is not entitled to a relaxed standard because the information he seeks is not exclusively in the possession of Brush." *Yuhasz*, 181 F.Supp.2d at 793.

Although Yuhasz now argues that he should not be required to plead information over which Brush has "constructive control," nowhere in his briefs to this court does he state that Brush's control is exclusive. Thus, Yuhasz apparently has now conceded that third parties possess information concerning the specific contracts at issue and the claims submitted for payment. As the district court correctly determined, "[c]ourts have held that [Rule 9(b)] may be relaxed where information is *only* within the opposing party's knowledge." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988) (emphasis added). Furthermore, although Yuhasz argues that he "cannot obtain the information demanded by the trial court absent discovery," there is no general right to discovery upon filing of the complaint. The very purpose of Fed. R. Civ. P. 12(b)(6) "is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829

F.2d 729, 738 (9th Cir. 1987). For all of these reasons, dismissal of Yuhasz's FCA claim is appropriate.

## IV.

The FCA protects employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government. Section 3730(h) of the FCA states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). In order to establish a claim for retaliatory discharge, a plaintiff must show: (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity. *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513-514 (6th Cir. 2000) (*McKenzie II*). The district court properly dismissed Yuhasz's retaliatory discharge claim, finding that Yuhasz had failed to allege that Brush had the required notice of Yuhasz's participation in protected activity.

"When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.

1996). Yuhasz claims that he "specifically informed and advised [Brush] of the unlawful and illegal nature of its certifications of compliance" and "specifically raised with [Brush], through Feldhouse, that other companies had incurred liabilities under the False Claims Act for submission of false and fraudulent claims." However, these allegations are insufficient to show that Brush knew Yuhasz was pursuing an FCA case when it discharged him.

In *Ramseyer*, the Tenth Circuit dismissed a retaliatory discharge action brought pursuant to the FCA, noting that "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties." 90 F.3d at 1523. The court added that the plaintiff "took no steps to put defendants on notice . . . that she was furthering or intending to further an FCA action rather than *merely warning the defendants of the consequences of their conduct.*" *Id.* (emphasis added). Similarly, the concerns about potential liability under the FCA raised by Yuhasz in this case were entirely within the scope of his duties, and thus did not put Brush on notice that he was engaging in protected activity. The complaint describes Yuhasz's duties as follows:

> [Brush] hired Yuhasz to design and establish, and then operate as a manager, a testing laboratory for its Lorain facility. . . . The laboratory was established to conduct certain chemical, mechanical and physical testing. Yuhasz also established the specifications for the laboratory equipment.

> \*\*\*

> Yuhasz conducted and or supervised testing procedures for [Brush's] Lorain facility.

> \*\*\*

On or about August, 1998, Yuhasz was appointed as the [Brush] employee charged with submitting the required certifications of compliance with the technical specifications of the alloys.

By informing Brush that its certifications were illegal and that other companies had incurred liability under the FCA for false claims, Yuhasz was simply performing his ordinary duties as a supervisor of laboratory testing. Brush cannot be charged with notice on this basis. *See Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994) (employer did not have notice where plaintiff's actions "were consistent with the performance of his duty").[1] The mere fact that Yuhasz told Brush that its certifications of compliance were "unlawful and illegal" does not establish notice. As the Sixth Circuit noted in *McKenzie II*, "a plaintiff still must show that his employer was aware of his protected activity. Merely grumbling to the employer about . . . regulatory violations does not satisfy the requirement." 219 F.3d at 518 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998)).

Yuhasz argues that this interpretation of the notice requirement "grants immunity to an employer who terminates the employee most likely to have information relevant to a *qui tam* action." This is not the case. As the court noted in *Ramseyer*, employees charged with investigating potential fraud are not automatically precluded from bringing a Section 3730(h) action. 90 F.3d at 1523 n. 7. In light of their ordinary responsibilities, however, such persons "must make clear their intentions of bringing or assisting in an FCA action

---

[1]Yuhasz's reliance on *McKenzie I* is misplaced. In *McKenzie I*, although the court found that by "show[ing] her supervisors a newspaper article about a similar fraud being perpetrated" against another company, plaintiff had placed the employer on notice, the court specifically noted that the plaintiff's "activities were not within the scope of her employment." 123 F.3d at 945. In the instant case, Yuhasz's activities fit squarely within the scope of his employment.

in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Id.*

## V.

Yuhasz argues that the district court erred in dismissing his claim for wrongful discharge in violation of Ohio common law and public policy. In his complaint, Yuhasz asserts:

It is the public policy of Ohio that an employee shall not be discharged, or otherwise subjected to a hostile work environment, for refusing his employer's directives to violate applicable laws and regulations. That public policy is manifested in the FCA, 31 U.S.C. § 3730(h), as well as in [Federal Acquisition Regulations] by reason of the strict certifications of compliance that are required.

The district court dismissed this claim, concluding that because the complaint failed to show a violation of the FCA, the complaint also failed to state a claim that Brush wrongfully discharged him in violation of Ohio public policy. This decision was correct.

In order to prevail on a wrongful discharge claim in violation of public policy under Ohio law, a plaintiff must show:

(1) a 'clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law;' (2) that 'dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;' (3) '[t]he plaintiff's dismissal was motivated by conduct related to the public policy;' and (4) '[t]he employer lacked overriding legitimate business justification for the dismissal.'

*Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 311 (6th Cir. 2000) (quoting *Painter v. Graley*, 70 Ohio St.3d 377,

384 n. 8 (Ohio 1994)). In *Parry*, the Sixth Circuit held that a plaintiff could not maintain a wrongful discharge claim in violation of Ohio public policy when the public policy was derived from an Ohio statute "substantially similar to the ADA" and the ADA claim had been dismissed. *Id.* at 312. The court explained that "[p]laintiff, having failed to show a viable claim under the ADA, is necessarily precluded from claiming that his termination violated public policy." *Id.* Similarly, since Yuhasz has failed either to state an FCA claim or to identify the specific provision of the Federal Acquisition Regulations manifesting the alleged "clear public policy," Ohio public policy cannot serve as a basis for his wrongful discharge action.

Yuhasz concedes that "if he is unable to demonstrate a violation of the FCA, he may not bring a claim for discharge in violation of the public policy therein," but argues that dismissal is not appropriate because "this public policy is also independently and more broadly embodied in the common law of Ohio." Under Ohio law, however, "when the employee's discharge is not actionable under the law that establishes the 'clear public policy,' the companion common-law claim for relief likewise fails as a matter of law." *Arsham-Brenner v. Grande Point Health Care Cmty.*, No. 74835, 2000 WL 968790, at *7 (Ohio App. July 13, 2000). Since the only "applicable laws and regulations" that Yuhasz alleges he was directed to violate are the FCA and the Federal Acquisition Regulations, and the complaint fails to state a claim with respect to either of these authorities, his common law public policy claim also must be dismissed.

## VI.

Yuhasz requested leave to amend his complaint in his October 5, 1999, response to Brush's motion to dismiss, and he contends that the district court abused its discretion by failing to grant his request. This argument lacks merit.

The district court declined to grant Yuhasz leave to amend, but it failed to specify the reasons for its decision. Pursuant to Fed. R. Civ. P. 15(a), a court should freely give leave to amend a complaint "when justice so requires." However, leave to amend may be denied where the amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962). When a district court denies a plaintiff's motion for leave to amend his complaint, this court generally reviews the decision for an abuse of discretion. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 783 (6th Cir. 2000). When the district court bases its decision to deny leave to amend on a legal conclusion that amendment would be futile, however, this court reviews the decision *de novo*. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002). Since the district court did not specify its reasons for denying leave to amend, the panel should conduct a *de novo* review. *See McKethan-Jones v. Ohio Dept. of Health*, 7 Fed. Appx. 475, 482, 2001 WL 345782, at *6 (6th Cir. 2001) (finding that "[t]he district court, by refusing to grant leave to amend the original complaint . . . , must implicitly have decided that such a claim was futile," and conducting *de novo* review).

According to Fed. R. Civ. P. 15(a), "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." The term "responsive pleading" is defined by reference to Fed. R. Civ. P. 7(a), which distinguishes between pleadings and motions, and provides an exclusive list of pleadings: a complaint (including a third party complaint), an answer to a complaint or a cross-claim, and a reply to a counterclaim. In this case, Brush never filed an answer. Consequently, Yuhasz was free to file an amended complaint at any time prior to the district court's entry of judgment. Yuhasz did not do so, but instead claimed in his response to Brush's motion to dismiss that he "has pled all the facts that he knows." In light of Yuhasz's admission, amendment would be futile. *See Old Republic Ins. Co. v. Hansa World Cargo Service, Inc.*, 170 F.R.D. 361, 383-384 (S.D.N.Y. 1997). ("[B]ecause [plaintiff] has conceded that it possesses no further facts to plead . . . , this

Court finds that leave to replead [plaintiff's] . . . claims should be denied as futile.") Because Yuhasz did not amend as a matter of right under Rule 15(a) and because amendment would have been futile in any event, the district court's denial of Yuhasz's request for leave to amend was proper.

Yuhasz also directly requests leave to amend from this court. This request is procedurally defaulted. The district court entered a final judgment dismissing the case on December 14, 2001. "Following entry of final judgment, a party may not seek leave to amend their complaint without first moving to alter, set aside or vacate the judgment pursuant to either Rule 59 or Rule 60 of the Federal Rules of Civil Procedure." *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002). Since Yuhasz never filed a Rule 59 or 60 motion following the district court's entry of judgment, he cannot now seek leave to amend.

## VII.

For all of the foregoing reasons, we affirm the judgment of the district court.